24-1588 (L)
In Re: Two Grand Jury Subpoenas Dated September 13, 2023

## UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

————————

August Term, 2024

(Argued: September 18, 2024    Decided: February 7, 2025)

Docket Nos. 24-1588-cv (L), 24-1589-cv (Con)

————————

IN RE: GRAND JURY SUBPOENAS DATED SEPTEMBER 13, 2023

————————

UNITED STATES OF AMERICA,

*Movant-Appellee,*

— v. —

SEALED APPELLANT 1, SEALED APPELLANT 2, AND SEALED APPELLANT 3,

*Respondents-Appellants.*[*]

————————

B e f o r e:

LYNCH, ROBINSON, AND MERRIAM, *Circuit Judges.*

————————

————————

[*] The Clerk of Court is respectfully directed to amend the official caption in this case to conform to the caption above.

Sealed Appellant 1, the former Chief Executive Officer ("CEO") of a publicly traded company ("the Company") and the subject of an ongoing grand jury investigation, and Sealed Appellants 2 and 3, a lawyer and law firm, respectively, that formerly represented Sealed Appellant 1 and the Company, appeal from an order of the United States District Court for the Southern District of New York (Caproni, *J.*) compelling Sealed Appellants 2 and 3 to produce documents withheld under a claim of attorney-client privilege in response to subpoenas issued by the grand jury. The district court held that the crime-fraud exception to attorney-client privilege applies to the subpoenaed documents, concluding that there was probable cause to believe that certain communications between Sealed Appellants 1 and 2 were made in furtherance of, among other violations, Sealed Appellant 1's attempts to criminally circumvent the Company's "legal contracts" control, which required the Company's legal department to review all significant contracts.

After first concluding that we have appellate jurisdiction over this appeal, we conclude that the crime-fraud exception applies to the communications at issue. Accordingly, we **AFFIRM** the district court's order compelling production of the documents.

––––––––––––––

ROBERT W. ALLEN, Kirkland & Ellis LLP, New York, NY (Patrick Gallagher and Yi Yuan, Kirkland & Ellis LLP, New York, NY, and Michael M. Purpura, Hueston Hennigan, Newport Beach, CA *on the brief*), *for* Sealed Appellant 1.

BENJAMIN S. FISCHER, Morvillo Abramowitz Grand Iason & Anello PC, New York, NY (Elkan Abramowitz, Thomas A. McKay, Peter Menz, and Abbe Ben-David, Morvillo Abramowitz Grand Iason & Anello PC, New York, NY *on the brief*), *for* Sealed Appellants 2 and 3.

SARAH MORTAZAVI, Assistant United States Attorney (Emily Johnson, Jared Lenow, and Danielle Sassoon, Assistant

2

United States Attorneys *on the brief*), *for* Damian Williams,
United States Attorney for the Southern District of New York.

————————————

GERARD E. LYNCH, *Circuit Judge*:

Sealed Appellant 1 is the former Chief Executive Officer ("CEO") of a

publicly traded company ("the Company"). He is also the subject of an ongoing

grand jury investigation concerning whether, as CEO, he engaged in a criminal

scheme to circumvent the Company's internal accounting controls – a violation of

15 U.S.C. §§ 78m(b)(2), 78m(b)(5) and 78ff(a) – and mislead Company auditors – a

violation of 15 U.S.C. §§ 7202, 7242, and 78ff(a) and 17 C.F.R. § 240.13b2-2 – in

order to conceal multiple allegations of sexual misconduct raised against him by

two former Company employees ("Victims 1 and 2").[1] Sealed Appellants 2 and 3

are a lawyer and law firm, respectively, that represented Sealed Appellant 1 and

the Company. As part of its investigation, the grand jury subpoenaed Sealed

Appellants 2 and 3 for documents reflecting communications between them and

Sealed Appellant 1 concerning Victim 1's and Victim 2's allegations.

————————————

[1] This appeal concerns proceedings currently before a grand jury. At present, no
indictments have been issued. Proceedings before the district court and before this court
were held in a closed courtroom, and the record and briefs are under seal. In order to
preserve the anonymity of the parties, we use pseudonyms and reveal only those facts
necessary to our decision.

Responding to these subpoenas, Sealed Appellants 2 and 3 withheld a subset of responsive documents based on assertions of attorney-client privilege raised by Sealed Appellant 1. The government then moved to compel Sealed Appellants 2 and 3 to produce those documents, arguing primarily that any privilege was defeated by the crime-fraud exception, which permits the government to obtain access to otherwise privileged communications that furthered an ongoing or future crime or fraud.

The district court (Valerie E. Caproni, *J.*) agreed with the government. It concluded that the crime-fraud exception applied because the government had "established probable cause to believe" that (1) "[Sealed Appellant 2] and [Sealed Appellant 1] circumvented [the Company's] internal controls and created false books and records in violation of 15 U.S.C. §§ 78m(b)(2), 78m(b)(5) and 78ff and 18 U.S.C. § 2, when they concealed the Victims' claims and settlement agreements from [the Company]," and (2) "they made false and misleading statements to the Company's auditors, in violation of 15 U.S.C. §§ 7202, 7242, and 78ff, 18 U.S.C. § 2, and 17 C.F.R. § 240.13b2-2." Special App'x at 11.[2] As a result, the court

---

[2] The abbreviation "Special App'x" refers to the Special Appendix, which contains the district court's sealed opinion and order. The abbreviation "Joint App'x" refers to the parties' Joint Appendix, which was also filed under seal. We see no basis for sealing or

ordered Sealed Appellants 2 and 3 to produce a sizeable portion of the withheld documents.  Sealed Appellants 1, 2, and 3 now appeal from that order.

Generally, disclosure orders are not final and therefore not appealable. Instead, the party subject to the order normally must first disobey the order and be held in contempt before the case is eligible for appeal.  *United States v. Punn*, 737 F.3d 1, 5 (2d Cir. 2013). Here, neither Sealed Appellant 2 nor Sealed Appellant 3 has defied the district court's order and been held in contempt.

Sealed Appellant 1 argues that we nevertheless have jurisdiction under a different, narrower exception to the final order rule established in *Perlman v. United States*, 247 U.S. 7 (1918). That exception allows the subject of a grand jury investigation to appeal a privilege order directly when the subject's privileged information is in the hands of a third party that is likely to disclose the information rather than subject itself to contempt. *Punn*, 737 F.3d at 6. We have

---

redacting this opinion that would outweigh the public's right of access to judicial documents necessary to understand the basis for our decision.

However, certain sealed information in the Special Appendix or the Joint Appendix is necessary to explain our reasoning. To the extent that our discussion of such information – even obliquely – requires unsealing, those words, only as they appear within this opinion, are unsealed. The underlying documents shall remain sealed. *See generally* Fed. R. Civ. P. 6(e); *Lawyers' Comm. for 9/11 Inquiry, Inc. v. Garland*, 43 F.4th 276 (2d Cir. 2022).

5

held that the exception provides us with jurisdiction when a client's attorneys have been ordered to produce his privileged materials to a grand jury over the client's objection. *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983* ("*Subpoena Duces Tecum Dated Sept. 15, 1983*"), 731 F.2d 1032, 1036 n.3 (2d Cir. 1984); *In re Katz*, 623 F.2d 122, 124 (2d Cir. 1980).  Because those are the facts here, we have jurisdiction over Sealed Appellant 1's appeal under the *Perlman* exception.

On the merits, we see no abuse of discretion in the district court's application of the crime-fraud exception to the attorney-client privilege. The district court did not clearly err in finding that one of the Company's internal controls required that all significant contracts be submitted to its legal department for review – in fact, its finding was based on Sealed Appellant 1's own statement to the Company's auditor that such a control was in place. It also did not clearly err in finding that the agreements, which addressed allegations of serious workplace sexual misconduct by the Company's CEO and involved millions of dollars in payments, were significant for purposes of that control. Finally, it did not clearly err in finding that Sealed Appellant 1 and Sealed Appellant 2's communications about the agreements helped to shield them from

6

the Company's legal department, circumventing that control. As a result, the

district court did not abuse its discretion in holding that the crime-fraud

exception applied.

We therefore AFFIRM the judgment of the district court.

BACKGROUND[3]

I.    **The Legal Contracts Control**

During the period relevant here, the Company was a public company

listed on the New York Stock Exchange. For decades, Sealed Appellant 1 had

been the Company's CEO and the Chairman of its Board of Directors.

As a public company, the Company was legally required to maintain

accurate books and records and to "devise and maintain a system of internal

accounting controls sufficient to provide reasonable assurances that . . .

transactions are recorded as necessary" to support accurate accounting. *See* 15

U.S.C. § 78m(b)(2). Its principal officers were also required to certify yearly that

they were "responsible for establishing and maintaining internal controls . . .

---

[3] The following background is based on facts presented without contest by the parties in their briefing and facts found by the district court following its review of the documentary record. As discussed below, we review the district court's factual findings under a clearly erroneous standard. *United States v. Mejia*, 655 F.3d 126, 131–32 (2d Cir. 2011).

[and] ha[d] designed such internal controls to ensure that material information relating to the [company] . . . is made known to [them]." 15 U.S.C. § 7241(a). In keeping with those obligations and his role as CEO, Sealed Appellant 1 repeatedly certified that he was responsible for establishing and maintaining effective internal controls for the Company.

When asked by the Company's auditors in 2019 to identify specific controls that helped ensure the accuracy and reliability of the Company's financial records, Sealed Appellant 1 explained that, among other measures, "[the l]egal department reviews all significant contracts." Joint App'x at 228. Later, when identifying "process level control activities" the Company had put in place to combat potential corruption, the auditors' 2018 Fraud Risk Assessment relied on that assertion, indicating that "[a]ll contracts are reviewed by the Legal Department." *Id.* at 146. As a result of that control, in combination with others, the auditor assessed the risk of corruption faced by the Company to be "low." *Id.*

## II.    Sealed Appellant 2's Legal Services Regarding the Victim 1 and 2 Agreements

During his tenure leading the Company, Sealed Appellant 1 relied for legal advice on Sealed Appellant 2, a partner at the law firm Sealed Appellant 3. Even

as to the corporate client, the relationship between Sealed Appellant 1 and Sealed

Appellant 2 was a close one: Sealed Appellant 2 noted that unlike the typical

outside counsel, he maintained direct contact with Sealed Appellant 1, not just

the Company's general counsel. Sealed Appellant 2 represented both the

Company and Sealed Appellant 1 personally throughout the relevant period.

Between 2018 and 2022, Sealed Appellant 2 helped Sealed Appellant 1

negotiate two non-disclosure agreements to which the Company was a party but

which were not disclosed to the Company's in-house legal department or its

auditors. Both agreements were made with female former Company employees

who had accused Sealed Appellant 1 of sexual misconduct.

A.    *Victim 1 Agreement*

In 2018, Victim 1 sought a meeting with Sealed Appellant 1 to discuss

allegations that he had sexually harassed and assaulted her. Victim 1 had worked

for the Company in 2004 and 2005. On December 3, 2018, her lawyer sent Sealed

Appellant 2 a demand letter alleging that Sealed Appellant 1 had attempted to

kiss her, exposed himself to her, and obtained non-consensual oral sex from her,

all while she was employed by the Company. The letter stated that Victim 1

believed that "her career ended because she refused to engage in consensual sex

with [Sealed Appellant 1]." *Id.* at 110. Though the letter did not contain an express threat to sue, it noted that Victim 1 sought $18 million for "resolution of any and all claims [Victim 1] has or may have against [the Company] and/or [Sealed Appellant 1]." *Id.* at 111. Sealed Appellant 2 apparently forwarded this letter to Sealed Appellant 1, and they exchanged messages the following day – two from Sealed Appellant 1 via email and another from Sealed Appellant 2 via text.

On or about December 10, Sealed Appellant 1 and Victim 1 met to discuss her claims and agreed on a settlement amount of $7.5 million. Sealed Appellant**s** 1 and 2 texted and called each other repeatedly over the next few days, including an approximately two-and-a-half hour call on December 22.

On January 7, 2019, Sealed Appellant 2 texted Sealed Appellant 1 a document titled "Settlement Agreement (Page Nos).pdf."*Id.* at 121. That night, Sealed Appellant 2 emailed a document with the same title to Victim 1's lawyer, asking him to "[p]lease obtain the necessary signatures and return [the] same to me."*Id.* at 149. As the title indicated, the attachment was a proposed settlement agreement. It provided that Sealed Appellant 1 would cause Victim 1 to be paid $7.5 million in installments over five years in exchange for confidentiality and a

10

release of any claims she or her husband had or might have had against Sealed Appellant 1 or the Company.

Following negotiations and revisions, Victim 1's lawyer informed Sealed Appellant 2 that they "ha[d] a deal" and that his client would execute the agreement. *Id.* at 756. Though certain provisions were added or altered from the original draft – including a provision that contemplated Victim 1's one day writing a book about her life story, possibly after Sealed Appellant 1's death – the fundamental terms of $7.5 million for confidentiality and a release remained consistent. The agreement specified that Sealed Appellant 1 would "cause . . . [this money] to be paid" to Victim 1, though the source of the funds was not specified. *Id.* at 235. However, the agreement did clarify that in the event that Victim 1 broke her promise to keep her allegations confidential, "neither [Sealed Appellant 1] nor [the Company] shall have any obligation to make any payments set forth above." *Id.* at 236. Victim 1's lawyer also sent Sealed Appellant 2 the information for the client trust account to which Sealed Appellant 1 could wire the necessary payments, noting that he "assume[d] [Sealed Appellants 1 and 2] would want zero paper trail."*Id.* at 756.

11

On February 13, 2019, the parties fully executed the final agreement. It was signed by Victim 1, her husband, her lawyer, Sealed Appellant 2, and Sealed Appellant 1 – on his own behalf and on behalf of the Company.[4] The agreement was not provided or disclosed to the Company's legal department. In fact, the documents provided to us *ex parte* include communications revealing that Sealed Appellant 2 specifically instructed Sealed Appellant 1 to transmit the executed agreement in a manner expressly intended to avoid the Company gaining knowledge of it.[5] The final agreement was stored in the files of Sealed

---

[4] The agreement had a signature page that included separate signature lines for Sealed Appellant 1 and the Company. Sealed Appellant 1 signed the agreement twice: once on his own behalf and once as Chairman of the Company.

[5] Although we have reviewed the materials contained in the contested documents submitted to the district court, and to us, on an *ex parte* basis, and find nothing in those documents that is inconsistent with the district court's findings and conclusions, we have generally limited our discussion of the facts in this opinion to evidence already known to the government from other sources. The sentence to which this note is attached is the only exception to that practice. Under other circumstances, it would be a closer question whether that sentence should be redacted from any version of this opinion accessible to the government pending any further review sought by Sealed Appellant 1. In this case, however, the documents in question have already been provided to the government by Sealed Appellants 2 and 3. See note 10 below. Thus, the government is already aware of the contents of the assertedly privileged communications, and the only relief that remains available to Sealed Appellant 1 is an order that the government return the documents and not present them or any statements made by Sealed Appellant 2 in interviews with the prosecution to the grand jury or at trial. Under those circumstances, there is no longer any interest in keeping the government from learning the contents of the *ex parte* submission that can outweigh the public interest in understanding the reasons for our ruling.

Appellant 3.[6] Ultimately, Sealed Appellant 1 made the payments owed under the agreement using funds that did not come from the Company.

B.    *Victim 2 Agreement*

Beginning in or around January 2022, Sealed Appellants 1 and 2 also negotiated an agreement with Victim 2. Victim 2 was hired as an employee at the Company in 2019 and worked there until February 2022. Sealed Appellant 1 allegedly initiated a sexual relationship with her immediately upon her hiring. He also allegedly pressured her to have sexual intercourse with other men, including another Company executive ("Executive 1"). In March 2021, he orchestrated her transfer to a different department, where she worked under Executive 1 and received a six-figure raise. Victim 2 alleged that Sealed Appellant 1 and Executive 1 sexually assaulted her at the Company's headquarters on at least two separate occasions.

---

[6] Sealed Appellants 1 and 2 also did not disclose Victim 1's initial $18 million demand or the settlement for $7.5 million to the Company or its auditors, even though Victim 1's claims, which, as noted above, referenced possible claims against the Company, remained unresolved on December 31, 2018, the end of the Company's fiscal year. Sealed Appellant 2 also failed to mention the claims in Sealed Appellant 3's January 31, 2019, audit response letter, which purportedly disclosed all pending or threatened litigation through January 25, 2019. And Sealed Appellant 1 did not mention the claims or settlement agreement in his February 7, 2019, management representation letter or his fraud inquiry interview with auditors on the same day.

13

In January 2022, Victim 2 spoke with Sealed Appellant 1 about a potential non-disclosure agreement. During that conversation, Sealed Appellant 1 allegedly expressed, in substance, that Victim 2 had the Company "over a barrel" in light of what she could reveal about him. Joint App'x at 629.

In the same month, Sealed Appellants 1 and 2 began again exchanging texts – some of which apparently included draft agreements bearing Victim 2's name. They also engaged in several calls of substantial length. On January 20, 2022, Sealed Appellant 2 sent Victim 2's lawyer a complete draft agreement. That draft provided for Victim 2 to be paid $3 million in exchange for her resignation, confidentiality, and release from all claims she had or may have had against Sealed Appellant 1 and/or the Company. It also included additional consideration in the form of a positive evaluation and recommendation from the Company to any possible future employer of Victim 2, at her request.

Following additional negotiations over the next week, Sealed Appellant 2 sent a revised draft to Victim 2's lawyer. The core terms remained the same.

Victim 2 signed the final agreement on January 28, 2022, and her lawyer sent the signed agreement to Sealed Appellant 2 on the same day. Three days later, Sealed Appellant 2 returned a countersigned page, which was also dated

14

January 28, 2022. As with the Victim 1 agreement, that page was signed by Sealed Appellant 1 on his own behalf and on behalf of the Company.[7] The agreement again was not provided or disclosed to the Company's legal department. Instead, it too was stored in the files of Sealed Appellant 3.[8] Ultimately, as with Victim 1, Sealed Appellant 1 made the payments owed to Victim 2 using funds that did not come from the Company.

## III.    The Special Committee Investigation

On March 30, 2022, the Company's Board of Directors received an anonymous email stating that Sealed Appellant 1 had had an inappropriate sexual relationship with Victim 2, and in a subsequent email to the board, the

---

[7] This agreement also had a signature page that included separate signature lines for Sealed Appellant 1 and the Company. Sealed Appellant 1 again signed the agreement twice: once on his own behalf and once as Chairman of the Company.

[8] Sealed Appellants 1 and 2 also did not disclose Victim 2's claims or the settlement for $3 million to the Company or its auditors, even though Victim 2's claims, allegedly acknowledged by Sealed Appellant 1 to have put the *Company* "over a barrel," Joint App'x at 629,  remained unresolved as of the cut-off date for Sealed Appellant 3's January 31, 2022, audit response letter, which purportedly disclosed all pending or threatened litigation through January 26, 2022. (The record demonstrates that Sealed Appellant 2 alerted another Sealed Appellant 3 lawyer that it was "Ok to send this [the audit response] now" approximately fifteen minutes after sending the countersigned page to Victim 2's lawyer on January 31. Joint App'x at 113; *see also* Special App'x at 5.) Sealed Appellant 1 likewise did not mention the claims or settlement agreement in his February 3, 2022, management representation letter or his fraud inquiry interview with the auditor the day before.

anonymous individual indicated that the Company had "paid [Victim 2] for her silence." Joint App'x at 447. The Board formed a Special Committee to investigate the allegations. During this period, Sealed Appellant 1 stepped down as CEO and chairman, though he denied the allegations. He also cautioned one board member that digging into allegations about Victim 1 and other women risked opening "Pandora's box" and causing "damage . . . to them . . . and to the company for sure." *Id.* at 448-50.

In June 2022, the Special Committee learned of the agreement between Sealed Appellant 1, the Company, and Victim 2. It demanded a copy of that agreement and any others between Sealed Appellant 1 and any other current or former Company employee. In response to that demand, Sealed Appellant 2 disclosed copies of the agreements with Victim 1 and Victim 2 to the Company's general counsel for the first time.

On July 25, 2022, the Company announced that it would restate its financial statements for the years of 2019, 2020, 2021, and the first quarters of 2021 and 2022 to account for $14.6 million in settlement payments that Sealed Appellant 1 had made or committed to make on behalf of the Company between 2006 and 2022 – including the $10.3 million in payments to Victims 1 and 2. The

Company explained that those payments previously "were not appropriately recorded as expenses in the Company's Consolidated Financial Statements." *Id.* at 482. However, the Company also concluded that "the quantitative and qualitative impact of these accounting errors" was such that the errors "were not material to its previously issued financial statements." *Id.*

## IV.    The Grand Jury Subpoenas

On September 13, 2023, the government served grand jury subpoenas on Sealed Appellant 2 and Sealed Appellant 3. Among other requests, the subpoenas sought all communications between and among Sealed Appellant 1 and lawyers or other personnel of Sealed Appellant 3 concerning Victims 1 and 2. On December 12, 2023, Sealed Appellants 2 and 3 substantially completed their initial production of materials responsive to the subpoena. The production included a privilege log indicating that Sealed Appellants 2 and 3 had withheld 208 documents based on assertions of attorney-client privilege raised by Sealed Appellant 1 and the Company.

## V.    Proceedings Below

On January 13, 2024, the government filed a motion to compel production of the documents withheld by Sealed Appellants 2 and 3. Sealed Appellants 1, 2,

17

and 3 opposed the motion. The Company, in contrast, waived any privilege it may have had over the documents. The district court permitted the government to file its motion under seal and to file certain exhibits *in camera* and *ex parte*. Following oral argument, it also reviewed the withheld documents *in camera*. In May 2024, while the motion to compel remained pending, Sealed Appellant 1 informed the court that he was no longer asserting privilege over 38 of the documents.

On June 3, 2024, the district court granted the motion to compel in part. It found probable cause that communications included in the documents were made in furtherance of a crime or fraud, vitiating Sealed Appellant 1's privilege claims. Specifically, it held that the government had "established probable cause to believe [Sealed Appellant 2] and [Sealed Appellant 1] circumvented [the Company's] internal controls and created false books and records in violation of 15 U.S.C. §§ 78m(b)(2), 78m(b)(5), and 78ff and 18 U.S.C. § 2, when they concealed the Victims' claims and settlement agreements from [the Company], and they made false and misleading statements to the Company's auditors, in violation of 15 U.S.C. §§ 7202, 7242, and 78ff, 18 U.S.C. § 2, and 17 C.F.R. § 240.13b2-2." Special App'x at 11.

18

It held that two internal controls were implicated: (1) the control that Sealed Appellant 1 had described to auditors in 2019, which required that the legal department review "all significant contracts" and (2) another control that required the legal department to provide information about potential legal contingencies to the accounting department. *Id.* at 15–16. Sealed Appellants 1 and 2 argued that these controls had not in fact been in place during the relevant period, based on the Company's later conclusion that its controls environment needed to be tightened, but that argument made no headway. The district court pointed to Sealed Appellant 1's own statement and observed that "however lax [the Company's] internal controls were . . . the Accounting Department, not the CEO, was responsible for making decisions about how to account for significant transactions." *Id.* at 16. The district court held that concealing the agreements and negotiations from the Company circumvented even those weak controls, violating 15 U.S.C. §§ 78m(b)(2), 78m(b)(5), and 78ff. *Id.*

In addition, the district court held that Sealed Appellant 2's failure to mention the Victims' claims as contingencies in Sealed Appellant 3's audit response letter and Sealed Appellant 1's failure to disclose the claims or settlements in his management representation letters or fraud inquiry interviews

19

with the auditor amounted to false or misleading statements to the Company's

auditors in violation of 15 U.S.C. §§ 7202, 7242, and 78ff, and 17 C.F.R.

§ 240.13b2-2.

Because the settlement agreements resolving the Victims' claims were

"structured and negotiated . . . to keep them hidden from [the Company]," the

district court found that "all communications about the claims and settlement

agreements were made in furtherance of the criminal scheme to keep [the

Company] and its auditors unaware of the allegations." Special App'x at 17. As a

result, the district court held that the crime-fraud exception applied to all but two

of the remaining documents (which the court determined did not appear to have

been made in furtherance of the scheme).[9]

Sealed Appellants 1, 2, and 3 now appeal that decision, and the district

court has stayed its order pending the appeal.[10]

---

[9] The district court also held that Sealed Appellant 1 had waived privilege as to any communications sent using the Company's corporate email system. Sealed Appellants 1, 2, and 3 do not challenge that decision on appeal.

[10] Subsequent to the district court's order, Sealed Appellants 2 and 3 voluntarily produced the documents and requested that Sealed Appellant 2 be interviewed pursuant to the exception to attorney-client privilege that permits a lawyer to disclose privileged communications in order to defend against allegations of wrongful conduct. *See, e.g.*, N.Y. Rules of Pro. Conduct 1.6(b)(5)(i). Prior to this disclosure and interview, the government and Sealed Appellant 1 reached an agreement that the government would not argue that this disclosure constituted a waiver of privilege by Sealed

## DISCUSSION

### I.     Jurisdiction

Before proceeding to the merits, we first must determine whether we have

jurisdiction over this matter – an issue the government disputes. "In general, a

party 'is entitled to a single appeal, to be deferred until final judgment has been

entered, in which claims of district court error at any stage of the litigation may

be ventilated.'" *Punn*, 737 F.3d at 4, quoting *Digital Equip. Corp. v. Desktop Direct,*

*Inc.*, 511 U.S. 863, 868 (1994). In keeping with that principle, 28 U.S.C. § 1291

extends federal appellate jurisdiction to "appeals from all *final decisions* of the

district courts of the United States." 28 U.S.C. § 1291 (emphasis added). "The

typical appeal under § 1291 is an appeal from an order that 'ends the litigation on

---

Appellant 1 or mooted this appeal. The government is entitled to waive the issue of
waiver of privilege. *United States v. Saladino*, 7 F.4th 120, 124 (2d Cir. 2021) (government
may waive or forfeit a non-jurisdictional argument by refusing to raise it); *United States
v. Quiroz*, 22 F.3d 489, 491 (2d Cir. 1994) (holding that the government waived a
privilege-based waiver argument by failing to raise it). Its agreement with Sealed
Appellants 2 and 3, however, is not conclusive of the mootness issue, which goes to our
jurisdiction. *Muhammad v. City of New York Dep't of Corr.*, 126 F.3d 119, 122 (2d Cir. 1997).
"[B]ecause [mootness] is a jurisdictional question, we must examine the issue *sua sponte*
when it emerges from the record." *Id.* (internal quotation marks omitted). On
consideration of that issue, however, we agree that the production of the documents
does not moot this appeal. If the district court's privilege ruling is erroneous, we can
provide effective relief by ordering the government to return the documents and not to
present the materials to the grand jury or use them at any trial that may result from the
investigation.

the merits and leaves nothing for the court to do but execute the judgment.'"

*Punn*, 737 F.3d at 4, quoting *Lauro Lines s.r.l. v. Chasser,* 490 U.S. 495, 497 (1989);

*see also In re Grand Jury Subpoenas Returnable Dec. 16, 2015*, 871 F.3d 141, 146 (2d

Cir. 2017) ("Our jurisdiction usually is limited to appeals from final judgments.").

"In general, an order denying a motion to quash a grand jury subpoena . . .

is not immediately appealable under § 1291," *Punn*, 737 F.3d at 5, because "[s]uch

an order generally lacks finality," *In re Grand Jury Subpoena for New York State*

*Income Tax Recs.*, 607 F.2d 566, 569 (2d Cir. 1979). Specifically, such an order

"leaves to the subpoenaed party the decision whether or not to comply with the

subpoena; and if that party does not comply it leaves to the other party the

decision whether or not it is worthwhile to seek a citation for contempt in order

to compel disclosure." *Id.* Thus, "[t]o obtain appellate review, the subpoenaed

person ordinarily must defy the district court's enforcement order, be held in

contempt, and then appeal the contempt order, which is regarded as final under

§ 1291." *Punn*, 737 F.3d at 6, quoting *In re Air Crash at Belle Harbor, New York on*

*November 12, 2001*, 490 F.3d 99, 104 (2d Cir. 2007).

"In some instances, however, the obligation to submit to contempt is

excused because 'the purposes underlying the finality rule require a different

22

result.'" *Id.*, quoting *In re Air Crash*, 490 F.3d at 105. One such instance is the

*Perlman* exception. *See Perlman v. United States*, 247 U.S. 7 (1918). Louis Perlman

was a witness for the plaintiff in a patent infringement suit. *Id.* at 8–9. In

connection with that suit, he produced certain materials, which were used as

exhibits at trial. *Id.* The materials were his personal property. *Id.* at 8. After the

case was submitted, the plaintiff moved to discontinue the action and dismiss it

without prejudice. *Id.* The court granted the motion on the condition that the trial

evidence, including Perlman's exhibits, be impounded in the custody of the clerk

of court. *Id.* at 9. Later, Perlman learned that (1) the lawyers in the patent

infringement suit had been ordered to show cause why the exhibits should not be

given to prosecutors as part of a grand jury investigation of his actions, and (2)

none of the lawyers had objected to the order. *Id.* Perlman then moved to restrain

the prosecutors from using the exhibits, arguing that doing so would amount to

an unreasonable seizure under the Fourth Amendment and force Perlman to

furnish evidence against himself in a criminal proceeding, in violation of the Fifth

Amendment. *Id.* at 10, 13. The Supreme Court held that Perlman could

immediately appeal the district court's denial of that motion. *Id.* at 13. Otherwise,

it explained, Perlman would be "powerless to avert the mischief of the order." *Id.*

In *Subpoena Duces Tecum Dated Sept. 15, 1983*, where a client appealed a district court's decision denying a motion to quash a grand jury subpoena directed at the client's former law firm, we pointed to *Perlman* and reached the merits of the client's appeal, noting that in the grand jury context, "[w]e have previously held . . . that a client whose attorney has been ordered to produce documents as to which the client has a privilege that would be defeated by such production may appeal the order as a final order under the doctrine of *Perlman*." 731 F.2d at 1036 n.3, citing *In re Katz*, 623 F.2d at 124. In *In re Katz*, we had similarly relied on *Perlman* to hold that an appeal was available to a client whose motion to intervene and quash a grand jury subpoena directed at his attorney was denied by the district court. 623 F.2d at 123–25.

Though our circuit's cases have not explained these holdings in great detail, at least one out-of-circuit case that our cases cite has done so. *See, e.g., id.* at 125, citing *Velsicol Chemical Corp. v. Parsons*, 561 F.2d 671, 673 (7th Cir. 1977). In *Velsicol Chemical Corp.*, the Seventh Circuit explained that "[i]t is one thing . . . for a lawyer to invoke the privilege when called to testify . . . and quite another to expect an attorney to defy a court order directing him to testify" despite his client's assertion of privilege. 561 F.2d at 674. In that case, the lawyer's

24

professional obligations would not require him to defy the district court's order, because under the relevant Code of Professional Conduct, "[a] lawyer may reveal . . . confidences or secrets *when . . . required by law or court order*." *Id.* at 674 n.1, quoting Model Code of Pro. Resp. DR 4-101(C)(2) (emphasis added). Thus, the court held, the lawyer should not be "expected to resist the court's order," despite the client's continued assertion of privilege. *Id.* at 674. Based on this reasoning, "[an a]ppellant's contention that his . . . interests are threatened, and that his attorney cannot be expected to protect those interests by being held in contempt, presents a paradigmatic case" subject to appeal under *Perlman*. *In re Katz*, 623 F.2d at 125.

Before us, the government has argued that the Supreme Court's more recent decision in *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100 (2009), should apply here instead of *Perlman*. In *Mohawk*, the petitioner attempted to bring an appeal in an ongoing civil case after the district court ruled that it had waived the attorney-client privilege over certain materials and ordered them disclosed. 558 U.S. at 103–04. The Eleventh Circuit declined to hear the appeal on the ground that the district court's privilege determination was not final for purposes of 28 U.S.C. § 1291. *Id.* at 105. The Supreme Court, in turn, assessed whether the

25

petitioner's appeal on privilege grounds should qualify for the "collateral order" exception to Section 1291's final order rule. *Id.* at 103. The collateral order exception permits appeals of "decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action." *Id.* at 106 (internal quotation marks omitted). The court held that the petitioner's privilege-related discovery order was *not* eligible for interlocutory appeal because it failed the third prong of this standard: it did not render the privilege issue "effectively unreviewable" because, in general, "[a]ppellate courts can remedy the improper disclosure of privileged material in the same way they remedy a host of other erroneous evidentiary rulings: by vacating an adverse judgment and remanding for a new trial in which the protected material and its fruits are excluded from evidence." *Id.* at 109.

Since *Mohawk*, we have joined several other circuits in holding that *Mohawk* controls and "the *Perlman* exception does not apply" if the privilege holder is a *party* to the litigation in which the subpoena was issued – "even if the subpoena was issued to a third party." *United States v. Rosner*, 958 F.3d 163, 167 (2d Cir. 2020) (emphasis added); *see also, e.g.*, *United States v. Krane*, 625 F.3d 568, 572–73

26

(9th Cir. 2010); *Drummond Co. v. Terrance P. Collingsworth, Conrad & Scherer, LLP*, 816 F.3d 1319, 1324 (11th Cir. 2016); *Holt-Orsted v. City of Dickson*, 641 F.3d 230, 238 (6th Cir. 2011). Under those circumstances, we reasoned that "the privilege holder may seek recourse through a post-judgment appeal." *Rosner*, 958 F.3d at 167.

To date, however, we have "express[ed] no opinion" on "whether the same reasoning would apply in the context of a grand jury subpoena," which is the central context of *Perlman*. *Rosner*, 958 F.3d at 167 n.1. In contrast, the Third Circuit *has* addressed that question. In *In re Grand Jury*, it concluded that "the *Perlman* exception remains viable" even after *Mohawk* where a privilege-holder who is the subject of the grand jury's investigation seeks to appeal a disclosure order. 705 F.3d 133, 146 (3d Cir. 2012). The Third Circuit stressed that its conclusion followed directly from the particular fact pattern in *Perlman*, where "Perlman himself sought to prevent the disclosure of documents to a grand jury that was conducting an investigation into whether he committed perjury in a patent infringement action." *Id.* Since then, the Third Circuit noted, "[t]he Supreme Court has not . . . suggested that Perlman's status as a grand jury subject would today deny him immediate appellate review." *Id.*

27

Moreover, the Third Circuit stressed, "the *Mohawk* Court gave no clear indication that this was a consequence of its intended holding," as "[i]t did not discuss, mention, or even cite *Perlman*." *Id.* Instead, it focused on the finer points of the collateral order doctrine – a different, albeit related, exception to Section 1291's finality requirement. *Id.* Given that lack of discussion and *Perlman*'s core fact-pattern, the Third Circuit "decline[d] to hold that the Supreme Court narrowed the *Perlman* doctrine—at least in the grand jury context—*sub silentio.*" *Id.* at 145.

Now squarely faced with the same issue, we agree. The Supreme Court has repeatedly instructed that "[a] Court of Appeals should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions" – even when that case "appears to rest on reasons rejected in some other line of decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989); *see also Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (same). Here, *Perlman* is directly on point. Thus, even though *Mohawk* is more recent, it leaves our *Perlman* jurisprudence undisturbed.[11]

---

[11] In any event, we conclude independently that *Mohawk* is significantly distinguishable from *Perlman*. The appellant in *Mohawk* was a party to an ongoing civil litigation. As the Supreme Court pointed out, any harm to its interests could be remedied by an appeal of an adverse judgment in that litigation, thus defeating application of the collateral order

As a result, we have jurisdiction here. Like the appellants in *In re Katz* and *Subpoena Duces Tecum Dated Sept. 15, 1983*, Sealed Appellant 1 objects to an order compelling his former lawyer and law firm to produce documents over which he continues to assert privilege. *In re Katz*, 623 F.2d at 124–25; *Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1036 & n.3. And like the lawyer in *Velsicol Chemical Corp.*, Sealed Appellants 2 and 3 are not bound by their professional obligations to maintain Sealed Appellant 1's privilege in the face of a contrary court order. 561 F.2d at 674.[12] Like the Seventh Circuit in that case, we do not expect lawyers, as officers of the court, to defy a court order and be held in contempt to protect a client's privilege, where the obligations of their profession

---

doctrine. *Mohawk*, 558 U.S. at 109. The grand jury context is significantly different. No criminal proceeding is under way, and Sealed Appellant 1 is not a party to the grand jury's investigation. *See United States v. Calandra*, 414 U.S. 338, 343–44 (1974) (describing the grand jury as an "ex parte investigation" and "not an adversary hearing"). The course of the investigation is unpredictable, but it is clear that disclosure of privileged materials to the grand jury could prejudice Sealed Appellant 1 in the eyes of the grand jurors. That is a present harm, warranting an immediate appeal. Accordingly, we believe that *Perlman* and *Mowhawk* are not inconsistent. Even if we were permitted to anticipate the Supreme Court's future overruling of *Perlman*, we believe that the Court, if and when it confronts the question, would hold that *Perlman* remains good law.

[12] Under the rules of professional conduct applicable in all states relevant to this matter, a lawyer's confidentiality obligation is no longer mandatory in the face of a court order.

29

do not demand such defiance.[13] Thus, without an appeal, Sealed Appellant 1 would be "powerless to avert the mischief of the order." *Perlman*, 247 U.S. at 13.[14]

At oral argument, the government pointed to two cases – *National Super Spuds, Inc. v. New York Mercantile Exchange*, 591 F.2d 174 (2d Cir.1979), and *In re Air Crash*, 490 F.3d 99 – that it said nevertheless stood for the proposition that the third party subject to the subpoena must be "disinterested" for the *Perlman* exception to apply. However, both cases are distinguishable from *Subpoena Duces Tecum Dated Sept. 15, 1983* and *In re Katz*. In *In re Air Crash*, the lawyer to whom the subpoena was directed sought to appeal – not the client who held the privilege. 490 F.3d at 106. This Court held that the *Perlman* exception was inapplicable specifically because that exception "is relevant only to appeals brought by the holder of a privilege where the disputed subpoena is directed

---

[13] To be clear, we do not suggest that state rules governing the legal profession could provide lawyers with a defense to a contempt charge or authorize lawyers to defy a subpoena. No such issue is presented in this case.

[14] Indeed, as discussed in note 10 above, the actual events in this case demonstrate that powerlessness. Although Sealed Appellants 2 and 3 asserted Sealed Appellant 1's privilege in response to the subpoenas, they produced the materials once their assertion of privilege was overruled, just as our decisions in this area predicted lawyers would do.

at *someone else*." *Id.*[15] And in *National Super Spuds*, we dismissed an appeal on the grounds that the individual subpoenaed was not, in effect, a third party. 591 F.2d at 179–80. Instead, that individual was an administrator for a government entity that was a party to the civil litigation at issue. *Id.* at 175. That administrator was "a responsible . . . employee who ha[d] dutifully followed the instructions of [the party's] counsel not to answer the questions at issue" and was "subject to the control of the . . . entity asserting [the] privilege." *Id.* at 179 & n.7. Under those circumstances, the validity of the *Perlman* exception was "more difficult to sustain," *id.* – especially because the only consequence of the employee entering contempt would be a fine, paid not by the employee but by his employer, *id.* at 180. Here, in contrast, Sealed Appellants 2 and 3 are an independent lawyer and law firm not subject to similarly close control by Sealed Appellant 1. *See also Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1036 n.3 (distinguishing

---

[15] We also declined that appeal on the basis that a lawyer who sought to appeal the privilege designation on his client's behalf, without that client's participation, "does not lack countervailing motivations to submit to contempt," because "the refusal to submit to such contempt under any circumstances might drive away clients in the future." *In re Air Crash*, 490 F.3d at 107. However, while our assessment of these incentives remains true, we decline to require a client who seeks to assert privilege on his own behalf to rely wholly on those "countervailing motivations" for protection.

*National Super Spuds* on similar grounds). Thus, neither case alters our analysis here.

Because we have jurisdiction over the present dispute via Sealed Appellant 1's appeal and because the government does not contest his standing to appeal, we need not address whether Sealed Appellants 2 and 3 have themselves demonstrated jurisdiction or standing to reach the merits of this appeal.[16]

## II.    Crime-Fraud Exception

On the merits, the government does not dispute that the materials at issue are presumptively privileged; thus, our next question is whether the district court properly held that those materials are subject to the crime-fraud exception, which would void that privilege. "The crime-fraud exception strips the privilege from attorney-client communications that were made "'in furtherance of contemplated or ongoing criminal or fraudulent conduct.'" *In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir. 1994), quoting *Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1038.

---

[16] To the extent that Sealed Appellants 2 and 3 raise helpful arguments in their briefing, we have treated that briefing "as, in effect, an *amicus curiae* submission." *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 92 (2d Cir. 2019).

A party seeking to invoke the crime-fraud exception must demonstrate that there is probable cause (1) "that the client communication or attorney work product in question was *itself* in furtherance of the crime or fraud" and (2) "to believe that the particular communication with counsel or attorney work product was *intended* in some way to facilitate or to conceal the criminal activity." *In re Richard Roe, Inc.*, 168 F.3d 69, 71 (2d Cir. 1999) (emphasis in original and internal quotation marks omitted). Stated differently, this standard requires "that a prudent person [would] have a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." *In re John Doe*, 13 F.3d at 637, quoting *Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1039. Under the exception, the attorney need not be aware that "his advice is sought in furtherance of such an improper purpose." *Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1038. "The fact that an innocent explanation may be consistent with the facts alleged . . . [also] does not negate probable cause." *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985).

We generally review rulings on the applicability of the attorney-client privilege for abuse of discretion. *United States v. Mejia*, 655 F.3d 126, 131 (2d Cir.

33

2011). An abuse of discretion occurs when the district court bases its ruling "on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.* at 132 (citation omitted). We review the factual determinations underlying a determination that the crime-fraud exemption vitiates the privilege for clear error. *United States v. Jacobs,* 117 F.3d 82, 87 (2d Cir. 1997), *abrogated in part on other grounds by Loughrin v. United States,* 573 U.S. 351 (2014). "Clear error" exists only when we are "left with a definite and firm conviction that a mistake has been committed." *United States v. Rajaratnam,* 719 F.3d 139, 153 (2d Cir. 2013), quoting *Brown v. Plata,* 563 U.S. 493, 513 (2011).

Following that standard, we hold that the district court did not abuse its discretion in applying the crime-fraud exception to the disputed documents here.

*First,* it is a federal crime to willfully "circumvent . . . a system of internal accounting controls or . . . falsify any book, record, or account." 15 U.S.C. §§ 78m(b)(5) (prohibiting circumvention and falsification), 78ff(a) (criminalizing willful violations of those prohibitions). "'Internal accounting controls' refers to the mechanism by which companies monitor their accounting system . . . for errors and irregularities in order to safeguard company assets and ensure that records are sufficiently reliable." *In re Ikon Office Sols., Inc.,* 277 F.3d 658, 672 n.14

34

(3d Cir. 2002); *accord, Monroe v. Hughes*, 31 F.3d 772, 773 (9th Cir. 1994) (noting in passing that "internal controls" are "the procedures used by the company to assure the reliability of its financial records"). "Examples of internal controls include manual or automated review of records to check for completeness, accuracy and authenticity; a method to record transactions completely and accurately; and reconciliation of accounting entries to detect errors." *McConville v. SEC*, 465 F.3d 780, 790 (7th Cir. 2006).

*Next*, the district court properly held that probable cause exists to believe that the Company's internal controls included a requirement that its legal department review all significant contracts. The support for the existence of this control came from Sealed Appellant 1 himself. When asked to identify controls that the Company relied on to ensure certain transactions were properly approved and reflected in its financial records, he explained that the "[l]egal department reviews all significant contracts." Joint App'x at 228. That statement was not casual. It was made by Sealed Appellant 1 *in his role as the Company's CEO and chairman* to the Company's auditors in a formal interview aimed at determining the Company's "risk of fraud and other material misstatements" in its accounting. *Id.* at 225 (capitalization removed). In that context, it was in Sealed

35

Appellant 1's interest to tout the company's robust internal controls, and the record reflects that the Company's auditors in fact relied on his statement to assess the risk of corruption faced by the Company as "low." *Id.* at 146. Thus, Sealed Appellant 1's statement provides clear support for the existence of such a control.

Moreover, such a legal contracts control fits neatly within other courts' understanding of internal controls. *See, e.g.*, *McConville*, 465 F.3d at 790, *Ikon*, 277 F.3d at 672 n.14; *Monroe*, 31 F.3d at 773. Legal review of all significant contracts would help ensure the completeness, reliability, and accuracy of financial records by, for example, ensuring that all liabilities were properly documented. From this evidence, a prudent person would have a reasonable basis to believe that a legal contracts control in fact existed.

Nevertheless, Sealed Appellant 1 argues that a CEO's recorded statement to auditors that a control exists is not sufficient evidence that the CEO's company in fact has such a control in place – at least in the absence of any internal policy documents describing the control in writing. Specifically, he notes that only after the Special Committee's investigation did the Company announce it would be instituting a written control providing that future quarterly statements to which

36

its executives would be required to attest would "include appropriate representation that all agreements have been properly reported to the accounting department." Sealed Appellant 1's Br. at 50–51, quoting Joint App'x at 518. That update, he urges, indicates that no such legal contracts control existed during the period relevant here.

But the Company's announcement does not say that it planned to institute a new legal contracts control – it notes a new requirement that officers affirmatively *attest* that all agreements have been properly reported. An attestation requirement would be compatible with a pre-existing legal contracts control like the one described by Sealed Appellant 1 in 2019 – it could strengthen as easily as create such a control. And indeed, this additional requirement was explicitly intended "to *enhance*" the Company's process for identifying and reporting agreements. Joint App'x at 518 (emphasis added). Thus, the new attestation requirement does not undermine the district court's finding in the way Sealed Appellant 1 suggests.

Moreover, as the government observes, Sealed Appellant 1 "identifies no legal requirement for internal controls to be memorialized in any particular format." Appellee's Br. at 30. Rather, he cites *United States v. Wittig* for the

proposition that internal controls should be demonstrated through "policy document[s]" like internal questionnaires completed by company executives. *See* Sealed Appellant 1's Br. at 49, citing 575 F.3d 1085 (10th Cir. 2009). But first, at no point does that case (which is out-of-circuit authority in any event) hold that a specific form of documentation is *necessary* for an internal control to exist for purposes of Sections 78m(b)(5) and 78ff(a). *See generally Wittig*, 575 F.3d 1085. And second, he fails to differentiate the questionnaire at issue in that case from the type of audit interview at issue here, which similarly involved standard, controls-minded questions directed at a company executive, the answers to which were also recorded in writing.

In sum, the fact that it might be *prudent* for a company to ensure that all the controls on which it relies are recorded in a particular internal format does not necessarily mean that a control exists only if it is documented that way. That observation is especially salient where the control aligns with common sense (like, for example, a requirement that company lawyers review significant company-related contracts) and when the company represents externally that the control is indeed in place. Thus, Sealed Appellant 1's counter-arguments do not undermine the district court's finding that there was probable cause to believe

that the Company had a legal contracts control in place during the relevant period.

*Next*, the district court also properly held that there was probable cause to believe that the victims' settlement agreements were "significant contracts" for purposes of this legal contracts control. Special App'x at 15-16. The Company was a party to both agreements, and Sealed Appellant 1 signed the agreements both in his personal capacity and in his capacity as Company chairman. Both Victims were former Company employees, and the claims at issue in both involved alleged workplace sexual misconduct by Sealed Appellant 1, the CEO and chairman of the Company, toward them. The agreements they signed explicitly noted the "substantial damages which would be done to [Sealed Appellant 1] *and to* [*the Company*]" should they fail to uphold their confidentiality obligations. Joint App'x at 236, 340 (emphasis added). And there is record evidence that Sealed Appellant 1 himself stressed to others that if revealed, these allegations would cause damage not just to him but also "to the [C]ompany for sure," *id.* at 449–50, and that Victim 2 reported that Sealed Appellant 1 had told her she had the Company "over a barrel" in light of the claims she could reveal, *id.* at 629.

Ultimately, the settlement agreements promised both victims several million dollars in exchange for their silence – $7.5 million for Victim 1 and $3 million for Victim 2. And though the agreement with Sealed Victim 1 stated that Sealed Appellant 1 would "cause . . . [this money] to be paid" to her, the source of the funds was not specified – meaning that the agreement did not explicitly state that the Company would not be responsible for any payments. *Id.* at 235. The agreement with Victim 2 stated more directly that "[Sealed Appellant 1] will pay" the sum provided, but it too did not explicitly disclaim the Company's responsibility for those payments. *Id.* at 339.

Further muddying the waters, the agreement with Victim 1 *did* specify that in the event that she violated her confidentiality obligations "neither [Sealed Appellant 1] *nor* [*the Company*] shall have any obligation to make any payments set forth above."*Id.* at 236 (emphasis added), making the earlier lack of specificity more notable. Victim 1 thus had a plausible argument that if she *did* comply with her obligations and Sealed Appellant 1 failed to make the required payments, she could look to the Company to make those payments instead. And the agreement with Victim 2 provided that, should Victim 2 wish for a positive letter of recommendation, *the Company* – not Sealed Appellant 1 – "agrees to provide a

40

positive evaluation and recommendation to any . . . possible employer of [her]."
*Id.* at 340. Given the resulting potential for ambiguity regarding the Company's
obligations under the agreements, in addition to the broader potential for liability
and damage to the Company inherent to the circumstances, a prudent person
would have a reasonable basis to believe that these agreements were "significant
contracts" that should have been reviewed by the Company's legal department
under the legal contracts control.[17]

    *Finally*, the district court properly held that there was probable cause to
believe that Sealed Appellant 1 intentionally used Sealed Appellant 2's legal
services to circumvent the legal contracts control. *First*, as discussed above,
Sealed Appellant 1 was clearly aware of the control – after all, he himself shared
it with the Company's auditors. *Id.* at 228. On top of that, as CEO, he was
routinely required to certify his awareness of the Company's internal accounting
controls in quarterly filings. *See* 15 U.S.C. § 7241(a). And *second*, Sealed Appellant
1 apparently took pains to ensure the agreements were not provided to the
Company's legal department. As an initial matter, he relied on external counsel

---

[17] That Sealed Appellant 1 actually made the payments from sources other than
Company funds is irrelevant to whether the agreements were "significant contracts" to
the Company *when made*.

to negotiate the agreements, without involving or even alerting the Company's own internal lawyers.[18] Additionally, even though the agreements were made on behalf of the Company, neither Sealed Appellant 1 nor Sealed Appellant 2 provided them to the Company for review or record-keeping; instead, both agreements were kept in the files of Sealed Appellant 3. When communicating with Sealed Appellant 2 about the agreements, Sealed Appellant 1 also apparently relied almost exclusively on text messages, rather than his Company email. As noted above, the documents provided to us *ex parte* include communications revealing that Sealed Appellant 2 specifically instructed Sealed Appellant 1 to transmit the executed agreement via text instead of email for the express purpose of avoiding the Company gaining knowledge of it. Draft legal agreements for both Victims were apparently exchanged this way as well.

Those facts provide a sufficient basis for a prudent person to believe that the settlement negotiations and resulting attorney-client communications were structured and intended to conceal the resulting agreements from the Company. As the district court explained, "[e]very edit to the draft agreement and every

---

[18] As the government notes, knowledge within the Company appears to have been strictly confined to two employees who had some limited knowledge of certain facts surrounding the agreements but were not aware that the Company was a party to them. Neither of these employees was a member of the legal or accounting departments.

42

discussion about the negotiations and how to structure the deals played a role in keeping the Victims quiet and the Company . . . in the dark." Special App'x at 17. Intentional concealment of the settlement negotiations from the Company could support a finding that Sealed Appellant 1 and Sealed Appellant 2 circumvented the legal contracts control – a criminal violation of 15 U.S.C. § 78m(b)(5). As a result, the district court properly held that probable cause existed to believe that the relevant communications were (1) "in furtherance of [a] crime or fraud" and (2) "intended . . . to facilitate or to conceal the criminal activity." *In re Richard Roe*, 168 F.3d at 71 (emphasis omitted). Thus, its application of the crime-fraud exception was not an abuse of discretion.[19]

---

[19] We emphasize the limited nature of our review here. The question before us is not whether any appellant is guilty of any crime, nor even whether the evidence before us is sufficient to permit a jury to find any crime beyond a reasonable doubt. The probable cause standard we address requires a more limited inquiry. As where that standard is used to determine the propriety of a search or seizure, the applicability of the crime-fraud exception involves determining whether the evidence presented justifies an intrusion into a legally-protected zone of privacy in the interest of permitting authorities to obtain evidence bearing on *whether* criminal charges should be brought. Many of the arguments made by Sealed Appellant 1 raise legitimate questions about what inferences should be drawn from the evidence presented. Those are questions that have yet to be assessed even by the prosecution and the grand jury in deciding whether to bring charges, let alone by a trial jury, which – if any charge is brought, would have to assess a more extensive record, under the rigorous constraints of an adversarial trial, by the demanding standard of proof beyond a reasonable doubt. We of course express no view about any of the questions to be decided by prosecutors, grand jurors, or any potential trial judge and jury as the investigation progresses. We hold only that the district court's finding of probable cause was not the product of clear factual error or

Because we hold that the district court did not err in deciding that these documents are subject to the crime-fraud exception based on the legal contracts control theory, we decline to address whether they are also subject to the exception on the other bases addressed by the district court.

## CONCLUSION

Accordingly, we AFFIRM the judgment of the district court.

---

abuse of discretion.